## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES PARKS,** | : | **CIVIL ACTION NO. 1:13-CV-2036** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SALISBURY BEHAVIORAL** | : | |
| **HEALTH,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Presently before the court in the above-captioned matter is the motion (Doc. 19) pursuant to Federal Rule of Civil Procedure 56 filed by Salisbury Behavioral Health ("Salisbury").  Salisbury seeks summary judgment with respect to all claims asserted by James Parks ("Parks"), a former employee, who alleges that Salisbury discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951–963.  For the reasons that follow, the court will grant Salisbury's motion for summary judgment.

## I.    <u>Factual Background & Procedural History</u>[1]

From December 2009 through February 2011, Parks was an employee of Salisbury.  (Doc. 21 ¶¶ 11, 44; Doc. 26 ¶¶ 11, 44).  Salisbury hired Parks to fill the role of special education teacher at its York School, located in York, Pennsylvania.

---

[1] To the extent facts are undisputed or supported by uncontroverted record evidence, the court cites directly to the parties' statements of material facts.

(Doc. 21 ¶ 11; Doc. 21-4 ¶ 4 (Declaration of Nichole Arnold)).  This appointment was provisional, pending Parks's completion of the Pennsylvania teaching certification requirements.  (Doc. 21 ¶ 11; Doc. 21-4 ¶ 4).  At commencement of employment, Parks was fifty-three years old.  (Doc. 21 ¶ 12; Doc. 26 ¶ 12).  His qualifications included a master's degree in special education as well as prior experience working with disabled children in a variety of settings.  (Doc. 21 ¶¶ 3, 4; Doc. 26 ¶¶ 3, 4).

In June 2010, Salisbury transitioned Parks from the role of special education teacher to full-time paraprofessional, a new position it created specifically for Parks.  (Doc. 21 ¶ 15; Doc. 21-4 ¶¶ 5, 6).  This reassignment occurred as a result of Parks's failure to obtain a Pennsylvania teaching certificate.  (Doc. 21 ¶ 16; Doc. 21-4 ¶ 5).  As a paraprofessional, Parks's responsibilities included providing assistance to teachers and helping students develop vocational skills.  (Doc. 21 ¶ 17; Doc. 21-6, Deimling Dep. 17:11-17:15, Mar. 17, 2014 ("Deimling Dep.")).

In December 2010, Salisbury permanently eliminated Parks's full-time paraprofessional position.  (Doc. 21 ¶¶ 18, 64; Doc. 26 ¶¶ 18, 64).  Parks subsequently accepted a part-time behavioral support staff ("BSS") position at the York School.  (Doc. 21 ¶ 19).  Salisbury asserts that "[d]ue to changes in student enrollment, the [c]ompany could no longer financially justify" the paraprofessional position.  (Doc. 21-4 ¶ 7; see Doc. 21 ¶ 18; Doc. 21-5, Kabiru Dep. 23:19-24:11, Mar. 17, 2014 ("Kabiru Dep."); Deimling Dep. 16:7-16:20).  Parks contends that after he left Salisbury, the company created a substantially similar paraprofessional position—designated "classroom assistant"—and hired two younger individuals to fill subsequent

openings.  (Doc. 26 ¶ 61; Doc. 27 at 14; Deimling Dep. 31:15-32:6; Doc. 21-15, Bhalla

Dep. 39:12-41:4, Mar. 17, 2014 ("Bhalla Dep.")).

As BSS, Parks typically worked with one student at a time to address

behavioral issues in the classroom.  (Doc. 21 ¶ 20; Deimling Dep. 18:2-18:14).  In this

role, Parks reported directly to Clinical Director Amy Clime Kabiru ("Kabiru").

(Kabiru Dep. 13:25-14:10).  Throughout his employment with Salisbury, Parks was

supervised by either Kabiru or Director of Education Jamie Deimling ("Deimling").

(Doc. 21 ¶ 13; Kabiru Dep. 13:25-14:10; Deimling Dep. 12:15-12:23).  Kabiru and

Deimling reported to Regional Vice President Nichole Arnold ("Arnold").  (Doc. 21

¶ 14; Kabiru Dep. 20:12-20:14).

On or about February 10, 2011, Parks was involved in an incident with an

eight- or nine-year-old autistic student.  (Doc. 21 ¶ 21; Doc. 26 ¶ 21).  During a group

activity in the classroom, the student began "throwing beads and acting out."  (Doc.

21 ¶ 31; Doc. 26 ¶ 31).  Next, according to Parks:

> [T]he student[] began punching the staff, and [another staff member]
> said, or I said, I believe, "please stop hitting," and [the student] said,
> "how about if I punch you in the nose," and – no, [the other staff
> member] said that, and [the student] said, "how about if I punch you in
> the nose," and he hit staff again in the stomach, and I took [the
> student's] hands and said, "you need to stop hitting."

(Doc. 21-2, Parks Dep. 32:19-33:3, Jan. 16, 2014 ("Parks Dep.") (alteration in

original)).  Upon learning of the incident, Kabiru immediately notified Arnold.

(Doc. 21 ¶ 23; Doc. 26 ¶ 23).  Arnold then contacted Office Manager Donna Eberts

("Eberts") and asked her to gather additional information from staff members at the

York School.  (Doc. 21 ¶ 24; Doc. 26 ¶ 24; Doc. 21-11, Eberts Dep. 20:11-20:24,

Mar. 18, 2014 ("Eberts Dep.")).  Eberts directed Assistant Office Manager Alan Wadsworth ("Wadsworth"), who was on location at the York School that day, to "handle the situation and get the details of what was going on."  (Eberts Dep. 22:2-22:8).  Specifically, Eberts instructed Wadsworth to obtain a statement from Parks and to place Parks on suspension without pay pending further investigation of the incident.  (Doc. 21 ¶ 24; Doc. 26 ¶ 24; Eberts Dep. 20:11-20:24).

Immediately following the incident, Parks left work due to a family emergency.  (Doc. 21 ¶ 26; Doc. 26 ¶ 26).  Parks did not return until February 23, 2011.  (Doc. 21 ¶ 27; Doc. 26 ¶ 27).  During this period, Wadsworth interviewed and obtained written statements from the five staff members who were present during the incident, at Eberts's instruction.  (Doc. 21 ¶ 28; Doc. 26 ¶ 28).  This group comprised Poonam Bhalla ("Bhalla"), Carla Hollinger ("Hollinger"), Donna Stinebaugh ("Stinebaugh"), Brianna DeLuca ("DeLuca"), and Justin Laucks ("Laucks").  (Doc. 21 ¶ 30; Doc. 26 ¶ 30).

Bhalla reported to Wadsworth that Parks "grabbed [the] student by the arms and yelled at him."  (Doc. 21-17 (Bhalla written statement)).  Bhalla's later testimony provided the same description.  (Bhalla Dep. 45:14-45:15).  Hollinger stated that after the student "turned around and hit [Parks's] leg[,] . . . [Parks] grabbed [the student's] arms and said, 'I'm tired of you hitting me.' "  (Doc. 21-19 (Hollinger written statement)).  She verified this account during her deposition.  (Doc. 21-9, Hollinger Dep. 19:18-20:24, Mar. 18, 2014 ("Hollinger Dep.")).

Similarly, Stinebaugh reported to Wadsworth that the student "punched [Parks] in the leg and said, 'Don't talk to me mister.' "  (Doc. 21-21 (Stinebaugh

written statement)).  Next, "[Park] turned toward [the student], took hold of [his] arm and said, 'I am tired of you hitting everyone.' " (Id.)  Stinebaugh offered the same description of the incident in her testimony.  (Doc. 21-16, Stinebaugh Dep. 47:19-48:11, Mar. 18, 2014 ("Stinebaugh Dep.")).  According to DeLuca's written statement, after the student made contact with Parks's leg, Parks "grabbed and squeezed [the student's] arms while screaming in his face." (Doc. 21-20 (DeLuca written statement)).  DeLuca confirmed this account during her deposition.  (Doc. 21-10, DeLuca Dep. 31:20-32:15, Mar. 18, 2014).  Finally, Laucks reported to Wadsworth that he "did not see much because [he] was concerned about [his assigned student] losing his cool." (Doc. 21-18 (Laucks written statement)).  Laucks's testimony verified that the student in his charge during the incident was "highly aggressive" and easily "set off by other kids." (Doc. 21-8, Laucks Dep. 27:14-27:20, Mar. 17, 2014 ("Laucks Dep.")).  As a result, Laucks focused on moving him "away from the incident, [either] outside the room or [to] another part of the room." (Laucks Dep. 30:1-30:6).

On February 23, 2011, Eberts and Deimling interviewed Parks regarding the incident.  (Doc. 21 ¶¶ 29, 38; Doc. 26 ¶¶ 29, 38).  Parks explained that he chose to take action because the student had punched him in the stomach.  (Doc. 26 ¶ 39; Eberts Dep. 26:8-26:12).  Eberts asked Parks to physically demonstrate his reaction to the student's misbehavior.  (Doc. 21 ¶ 39; Doc. 26 ¶ 39).  Consequently, Parks "grabbed [Eberts's] wrists and used a firm voice." (Doc. 21 ¶ 39; Doc. 26 ¶ 39).  At the conclusion of the interview, Eberts informed Parks that his employment was suspended pending further investigation of the incident.  (Doc. 21 ¶ 40; Doc. 26 ¶ 40).

Thereafter, Eberts recommended that Salisbury terminate Parks's employment.  (Doc. 21 ¶ 41; Doc. 26 ¶ 41).  Eberts relied upon the information provided by the five staff members who were present during the incident to make this recommendation.  (Doc. 21 ¶ 41; Doc. 26 ¶ 41).  Ultimately, Human Resources Director Michelle Smith ("Smith") and Arnold jointly made the decision to terminate Parks.  (Doc. 21 ¶ 42; Doc. 21-23, Smith Dep. 28:8-28:11, Mar. 17, 2014 ("Smith Dep."); cf. Doc. 21-7, Arnold Dep. 13:1-14:4, Mar. 17, 2014 ("Arnold Dep.") ("I made the decision to terminate his employment. . . . [in] consult[] with . . . . Donna Eberts [and] Michelle Smith.")).  Neither Deimling nor Kabiru participated in the decisional process.  (See Doc. 21 ¶¶ 46-48; Doc. 26 ¶¶ 46-48).  On February 24, 2011, Eberts called Parks to inform him that his employment was being terminated.  (Doc. 21 ¶ 44; Doc. 26 ¶ 44).

Arnold testified that she "relied heavily upon the [accounts provided by] the people that witnessed the incident" to determine that Parks "reacted in a way that appeared to be out of his own frustration or anger towards a student."  (Arnold Dep. 55:24-56:2).  She explained that Salisbury does not tolerate "that kind of behavior by a staff member."  (Id. 58:20-58:22).  The record indicates that Salisbury provided mandatory crisis intervention training to prepare its employees for behavioral episodes in the classroom.  (Parks Dep. 30:14-32:12; Hollinger Dep. 11:18-12:5).  Specifically, as a part of his orientation to Salisbury, Parks completed training on nonviolent methods of restraining misbehaving students.  (Doc. 21 ¶ 54; Doc. 26 ¶ 54; Doc. 25-26 (Parks training records)).

6

Parks asserts that, during his employment with Salisbury, he suffered from heart stents, hypertension, high cholesterol, and a cracked rib. (Doc. 21 ¶ 6; Doc. 26 ¶ 6). He avers that these conditions caused him to be short of breath and limited his ability to lift heavy objects and to perform strenuous exercises. (Doc. 21 ¶ 7; Doc. 26 ¶ 7). Parks states that he took nitroglycerin pills for treatment. (Doc. 21 ¶ 7; Doc. 26 ¶ 7). Although he did not formally request accommodations for these medical conditions, he did seek assistance from co-workers when it took "over 15 to 30 minutes to contain" disorderly students. (Doc. 21 ¶ 8; Doc. 26 ¶ 8; Parks Dep. 24:15-25:15). Parks also claims that he suffered from pneumonia during the weeks prior to his termination. (Doc. 27 at 11).

In addition, Parks alleges that Deimling and Kabiru "often made jokes about [his] age in staff meetings and in the classroom." (Doc. 21 ¶¶ 55, 70; Doc. 26 ¶¶ 55, 70). Parks estimates that these remarks commenced during the summer of 2010 and occurred "probably at least once a week, if not more." (Doc. 21 ¶¶ 73, 74; Doc. 26 ¶¶ 73, 74). For example, according to Parks, "Statements often began with, '[s]omeone of your age . . . .' [a]nd '[s]omeone as old as you . . . .' " (Doc. 21 ¶ 55). Parks avers that Kabiru once remarked, "I can't believe someone as old as you would like [music by a modern musician]." (Doc. 21 ¶ 71; Doc. 26 ¶ 71). Additionally, Parks contends that upon sharing his suspicion that Salisbury planned to terminate him due to his age and medical conditions, the York School secretary commented that she "could tell [him] things that would curl [his] hair." (Doc. 21 ¶ 89; Doc. 26 ¶ 89). Parks is unable to recall the secretary's name. (Doc. 21 ¶ 90; Doc. 26 ¶ 90). He also states that because he often wore a sweater to work,

Kabiru made "many jokes about old man sweaters and thin blood and looking like 'Mr. Rogers.' " (Doc. 21 ¶ 71; Doc. 26 ¶ 71).  Furthermore, Parks testified that on a day in spring, after he requested permission to take his class outside for a nature walk, either Deimling or Kabiru responded by asking, "Are you sure you can make it that far?" (Doc. 21 ¶ 72; Doc. 26 ¶ 72).  Finally, Parks contends that on one occasion, after he submitted a doctor's note to Kabiru, she remarked, "You sure go to the doctor a lot." (Doc. 21 ¶ 75; Doc. 26 ¶ 75).  He is unable to recall when this occurred or whether anyone else was present at the time. (Doc. 21 ¶¶ 76, 77; Doc. 26 ¶¶ 76, 77).

In response to these allegations, Salisbury demonstrates that the policies set forth in its employee handbook prohibit discrimination and harassment based on age and disability. (Doc. 21 ¶ 49; Doc. 26 ¶ 49).  Salisbury's harassment policy states the following: "Any employee who believes he/she has been harassed should immediately notify his/her Office Manager.  If the employee is uncomfortable notifying the Office Manager, the employee should notify the Vice-President of their region.  All complaints and related information will be kept confidential to the extent possible without compromising investigation." (Doc. 21 ¶ 50; Doc. 26 ¶ 50). According to Salisbury, Parks received these materials and agreed to follow the policies therein. (Doc. 21 ¶ 51; Doc. 26 ¶ 51).  Parks testified that he failed to comply with Salisbury's reporting policy because two co-workers, who he was unable to identify, told him "it was a bad idea to do so and would just cause trouble." (Doc. 21 ¶ 53; Doc. 26 ¶ 53).

Parks filed this action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951–963.  (See Doc. 1).  Specifically, Parks alleges that Salisbury discriminated against him on the basis of age and disability.  (Id. ¶¶ 28-40).  On April 25, 2014, Salisbury filed the instant motion (Doc. 19) for summary judgment, alleging that Parks has failed to proffer evidence sufficient to support his claims. The motion has been fully briefed and is ripe for disposition.

## II.   <u>Legal Standard</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u> <u>also</u> FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

### III.   <u>Discussion</u>

Parks alleges that Salisbury discriminated against him on the basis of age and disability by demoting his employment from full-time to part-time status and by terminating his employment thereafter.  The court will address these claims *seriatim*.[2]

### A.   **Age Discrimination**

Parks asserts that Salisbury violated the ADEA by "demoting [Parks] to part-time status" and by "terminating his employment . . . as a result of his age."  (Doc. 1 ¶ 36).  Specifically, Parks avers that he was replaced by significantly younger employees and that his co-workers made a variety of discriminatory remarks regarding his age.  (Doc. 27 at 13).  Salisbury responds that Parks proffers "no evidence to create an inference" that it was motivated by discriminatory animus towards his age.  (Doc. 20 at 5).

The ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  Its protections are limited to persons forty

---

[2] Parks's PHRA claims are properly analyzed under the same legal standard as his ADA and ADEA claims.  <u>See</u> <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996) ("While the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, . . . its courts nevertheless generally interpret the PHRA in accord with its federal counterparts."); <u>e.g.</u>, <u>Glanzman v. Metro. Mgmt. Corp.</u>, 391 F.3d 506, 509 n.2 (3d Cir. 2004) ("[T]he same legal standards and analysis are applicable to claims under both the ADEA and the PHRA."); <u>Ripple v. Olympic Steel, Inc.</u>, No. 1:12-CV-2234, 2014 WL 509200, at *1 (M.D. Pa. Feb. 10, 2014) ("[O]ur analysis of Plaintiff's ADA claim applies with equal force to his PHRA claim.") (citing <u>Kelly</u>, 94 F.3d at 105).  Hence, the foregoing discussion applies equally to Parks's PHRA claims.

years of age or older.  § 631(a).  The court analyzes ADEA discrimination claims

based on circumstantial evidence under the burden-shifting framework articulated

in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  <u>See</u> <u>Smith v. City</u>

<u>of Allentown</u>, 589 F.3d 684, 689 (3d Cir. 2009) (citing <u>Keller v. Orix Credit Alliance,</u>

<u>Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997)); <u>Fasold v. Justice</u>, 409 F.3d 178, 184 (3d Cir.

2005).  First, a plaintiff must make out a *prima facie* case of age discrimination by

showing that: (1) he is forty years of age or older; (2) he was qualified for the

position which he held; (3) he suffered an adverse employment action; and (4) he

was replaced by an employee sufficiently younger to give rise to an inference of age

discrimination.  <u>See</u> <u>Smith</u>, 589 F.3d at 689-90 (citing <u>Potence v. Hazelton Area Sch.</u>

<u>Dist.</u>, 357 F.3d 366, 370 (3d Cir. 2004)); <u>Fasold</u>, 409 F.3d at 184.  Once the plaintiff

establishes a *prima facie* case, the burden shifts to the defendant employer to

articulate one or more legitimate, nondiscriminatory reasons for taking adverse

employment action against the plaintiff.  <u>See</u> <u>Smith</u>, 589 F.3d at 690; <u>Fasold</u>,

409 F.3d at 184.  If the employer does so, the plaintiff must prove by a

preponderance of the evidence that the employer's articulated reasons for its

employment action were merely pretext for age discrimination.  <u>See</u> <u>Smith</u>,

589 F.3d at 690; <u>Fasold</u>, 409 F.3d at 184.  The ultimate burden of persuasion remains

with the plaintiff at all times.  <u>See</u> <u>Smith</u>, 589 F.3d at 690.

In the instant matter, the parties agree for purposes of Rule 56 that Parks has

established the first three elements of his *prima facie* case: he was fifty-five years

old when terminated; he was qualified for the various positions he held at the York

School; and he suffered adverse employment actions when Salisbury changed his

status from full-time to part-time and later terminated his employment.  (Doc. 20 at 5 n.1); see Smith, 589 F.3d at 689-90; Fasold, 409 F.3d at 184.  However, Salisbury contends that Parks has failed to satisfy his *prima facie* burden because he is unable to create an inference of discriminatory animus.  (Doc. 20 at 5).  On the present record, the court is compelled to agree.

Parks asserts that Salisbury created the classroom assistant position after his termination to "subsume[] [his paraprofessional] job responsibilities" and subsequently hired "two women in their twenties" to fill the position.  (Doc. 27 at 13).  As Salisbury observes, Parks relies exclusively on the deposition testimony of Deimling and Bhalla to establish that: (1) Salisbury created the classroom assistant position after Parks's termination; (2) the position is substantially similar to Parks's paraprofessional position; and (3) two women between the ages of twenty and thirty have occupied the position.  (See Doc. 30 at 11).

Indeed, Deimling confirmed that Salisbury created the classroom assistant position after Parks's termination and that the position is similar to the former paraprofessional role.  (Deimling Dep. 31:15-31:25).  Deimling was unable to recall which individuals have been hired as classroom assistants or whether the position has been filled on a full-time or part-time basis.  (Id. 32:1-32:9).  Bhalla's deposition testimony was equally imprecise.  Her comments comparing the paraprofessional role to the classroom assistant role were unclear, (Bhalla Dep. 39:12-40:9), and she otherwise testified that two women named Tiffany and Tammy, who were "probably in [their] twenties," were hired as "teacher assistants" sometime after Parks's termination.  (Id. 40:15-41:9).  She stated twice that she did not know when

12

they were hired.  (Id. 40:24-41:2 ("I don't know the dates. . . . I don't know when they were hired.")).

Quite clearly, there is insufficient evidence from which a factfinder could infer that Parks was ultimately replaced by a younger employee.  First, Parks has failed to establish that the classroom assistant position subsumed the paraprofessional position.  See Mahler v. Cmty. Coll. of Beaver Cnty., --- F. Supp. 2d ---, No. 2:11-CV-01610, 2014 WL 4188073, at *11 (W.D. Pa. Aug. 22, 2014) ("If a plaintiff is in a unique position which is eliminated . . . he can establish the fourth element [of the *prima facie* case] by 'demonstrating that the remaining responsibilities of [his] position were transferred to persons outside the protected class.' " (quoting Torre v. Casio, Inc., 42 F.3d 825, 830-31 (3d Cir. 1994)).  Deimling merely testified that the classroom assistant's duties are similar to Parks's former responsibilities as a paraprofessional.  (Deimling Dep. 31:15-31:25).  She did not address the extent to which the duties of the second position parallel those of the first.  By relying exclusively on Deimling's conclusory statement, Parks fails to present a meaningful comparison of the two roles.  (Id.)  The court is unable to consider, for example, the job duties of the two positions, the degree of similarity, the start and end dates of the relevant employees, or the positions' respective salaries and benefits.  Cf. Mahler, 2014 WL 4188073, at *11 (finding sufficient evidence of record to demonstrate that the majority of plaintiff's specific job duties were subsumed by a newly created position).  Moreover, assuming *arguendo* that the classroom assistant position effectively replaced the paraprofessional position, Parks's evidence that Salisbury hired a younger person is woefully inadequate.

13

See Nilson *ex rel.* Nilson v. Hershey Entm't & Resorts Co., 649 F. Supp. 2d 378, 385 (M.D. Pa. 2009) (observing that proffered evidence "must amount to more than a mere scintilla" in order to survive summary judgment (quoting Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001)).  Aside from Bhalla's vague testimony that two women who were "probably in [their] twenties" were hired as "teacher assistants" on undetermined dates, Parks does not direct the court to any objective evidence of record in support of his assertion that Salisbury hired younger employees to fill the classroom assistant role.  (Bhalla Dep. 40:15-41:9).  Thus, even drawing all reasonable inferences in favor of Parks, the court is unable to conclude that Salisbury transferred Parks's paraprofessional responsibilities to a younger employee.

Parks also endeavors to establish an inference of age discrimination by alleging that Deimling and Kabiru made a variety of ageist remarks over the course of his employment with Salisbury, (Doc. 21 ¶¶ 55, 70; Doc. 26 ¶¶ 55, 70):
(1) Deimling's and Kabiru's regular "jokes about [Parks's] age in staff meetings and in the classroom," (Doc. 21 ¶¶ 55, 70; Doc. 26 ¶¶ 55, 70); (2) Kabiru's statement of disbelief that "someone as old as [Parks] would like [music by a modern musician]," (Doc. 21 ¶ 71; Doc. 26 ¶ 71); and (3) Kabiru's "many jokes about old man sweaters

and thin blood and looking like 'Mr. Rogers,' " (Doc. 21 ¶ 71; Doc. 26 ¶ 71).[3]

Additionally, Parks contends that upon sharing his suspicion that Salisbury planned to terminate him due to his age and medical conditions with the York School secretary, the secretary responded that she "could tell [him] things that would curl [his] hair."  (Doc. 21 ¶ 89; Doc. 26 ¶ 89).  She offered no specific examples, and Parks was unable to recall her name.  (Doc. 21 ¶ 89; Doc. 26 ¶ 89).

The court recognizes that the burden of proving a "*prima facie* case under the McDonnell Douglas . . . framework is not intended to be onerous."  Sempier v. Johnson & Higgins, 45 F.3d 724, 728-29 (3d Cir. 1995).  Furthermore, the Third

---

[3] Parks raises a litany of additional claims.  He asserts that: "(1) [Parks] and another employee were told '[i]f you're laughing you're not working . . .' and to '[d]e-stress on your own time;' (2) [Salisbury required Parks to] drive an hour to the Harrisburg facility on a regular basis; (3) when [Parks] was suspended he was told harshly to leave the key at the building; . . . (4) an employee of [Salisbury incorrectly represented] . . . that when [Parks] was terminated [he] said, 'you'll hear from my lawyer;' " (5) in 2008, Deimling reprimanded Parks for disposing of food containers in the employee refrigerator; (6) in 2008, Deimling yelled at Parks and another employee for conversing privately about politics; and (7) Salisbury kept protected medical information in Parks's personnel file.  (Doc. 20 at 6-7; see Doc. 21 ¶¶ 9, 10, 55, 78-88; Doc. 26 ¶¶ 9, 10, 55, 78-88).  Salisbury contends that certain of these alleged events pre-date Parks's employment with Salisbury, which began in December 2009.  (Doc. 20 at 7 n.3).  Salisbury also argues that Parks has provided no evidence to show that these averments relate "in any way . . . to his age or alleged disabilities."  (Doc. 20 at 7).  In response, Parks merely claims that "[t]he cited testimony speaks for itself."  (Doc. 26 ¶¶ 85, 87).  Because Parks has failed to demonstrate even the slightest connection between these bare assertions and his discrimination claims, the court declines to address them further.  See generally O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311-12 (1996) ("[T]here must be at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption."); Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) ("[S]ummary judgment is particularly appropriate where . . . the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor."); Gulick v. City of Pittston, 995 F. Supp. 2d 322, 331 (M.D. Pa. 2014) ("The Court need not accept mere conclusory allegations . . . .").

Circuit has explained that the fourth element must sometimes be relaxed as "the nature of the required showing . . . depends on the circumstances of the case." Torre, 42 F.3d at 830 (quoting Massarsky v. General Motors Corp., 706 F.2d 111, 118 n.3 (3d Cir. 1983)); see also Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999) (modifying the fourth element for reduction in force cases); Grabosky v. Tammac Corp., 127 F. Supp. 2d 610, 621 (M.D. Pa. 2000) ("Requiring a terminated plaintiff to show replacement by a younger person is a mechanistic and ritualistic approach that may serve to defeat otherwise meritorious claims."); Gupta v. Sears, Roebuck & Co., No. 07-243, 2009 WL 890585, at *20 (W.D. Pa. Mar. 26, 2009) ("[T]he essential inquiry in a *prima facie* termination case under the McDonnell Douglas analysis is not necessarily whether a plaintiff is replaced by someone outside the protected class. . . . [but] [r]ather, the essential issue is whether the plaintiff was discharged under circumstances giving rise to an inference of discrimination." (citing Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 357 (3d Cir. 1999)). In the matter *sub judice*, however, Parks's allegations of stray remarks fall short of making out the fourth element of his *prima facie* case.

It is well-established that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); see Miller v. Berry Metal Co., 80 F. App'x 245, 248 (3d Cir. 2003) (holding that comments "likely made in jest" do not give rise to an inference of discrimination); Drwal v. Borough of West View, 617 F. Supp. 2d 397, 417 (W.D. Pa. 2009) (finding that a discriminatory

16

remark was "not probative evidence of discriminatory intent" when the speaker "was not a decisionmaker within the hierarchy" of the organization and the remark was "not related to the adverse employment actions alleged"); Tenthoff v. McGraw-Hill, Inc., 808 F. Supp. 403, 407 (E.D. Pa.) aff'd, 981 F.2d 1248 (3d Cir. 1992) ("To say, with a negative connotation, that someone works like an old man or an old woman can certainly be in bad taste, but, without more, is quite remote from establishing a policy of discrimination.").  In the instant case, the undisputed record evidence demonstrates that Deimling and Kabiru were not decisionmakers in the contested adverse employment actions.  (Doc. 21 ¶¶ 42, 46-48; Doc. 26 ¶¶ 46-48; Smith Dep. 28:8-28:11; Arnold Dep. 13:1-14:4); see Ezold, 983 F.2d at 545. Additionally, the temporal proximity between the allegedly discriminatory remarks and Parks's demotion and termination is largely uncertain.  See Ezold, 983 F.2d at 545.  Parks was demoted in December 2010 and terminated in February 2011.  (Doc. 21 ¶¶ 18, 40, 64; Doc. 26 ¶¶ 18, 40, 64).  He estimates that Deimling's and Kabiru's regular "jokes about [his] age in staff meetings and in the classroom" began during the summer of 2010.  (Doc. 21 ¶¶ 55, 70; Doc. 26 ¶¶ 55, 70).  Otherwise, he provides no temporal context for the specific comments he sets forth as evidence of Salisbury's discriminatory animus.  Without a more substantial link between Parks's allegations and Salisbury's employment actions, the evidence of record is

insufficient to establish a general disfavor towards individuals over the age of forty.[4]

The court concludes that Parks cannot make out a *prima facie* case under the ADEA because he has failed to proffer sufficient evidence to support an inference of age discrimination. Accordingly, Salisbury is entitled to summary judgment with respect to Parks's age discrimination claim.

## B.    Disability Discrimination

Parks also contends that Salisbury violated the ADA by demoting him and ultimately terminating him out of hostility towards his disabilities. (Doc. 1 ¶ 32). Parks offers a number of theories in support of this claim. He first avers that genuine disputes of material fact exist regarding the events that transpired on February 10, 2011. (Doc. 27 at 11). Parks additionally argues that Arnold misrepresented Salisbury's reasons for terminating his employment. (Id. at 11-12).

---

[4] The court notes that Salisbury's initial willingness to hire Parks at the age of fifty-three may also be considered as *evidence* of Salisbury's nondiscrimination. See Nieto v. L&H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997) ("[I]t is unlikely that a decision maker would hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." (internal quotation marks omitted)); Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("[C]laims that employer animus exists in termination but not in hiring seem irrational." (internal quotations marks omitted)); Fitzpatrick v. Nat'l Mobile Television, 364 F. Supp. 2d 483, 501 (M.D. Pa. 2005) ("[Employer's act of] hir[ing] Plaintiff when he was 50, and . . . fir[ing] him at age 51 . . . [is] probative of a lack of discrimination." (citing Waldron v. SL Indus., Inc., 56 F.3d 491, 496 (3d Cir. 1995)). However, placed in proper context, this evidence does *not* give rise to an inference that Salisbury lacked discriminatory animus. The court recognizes that, unlike the Fourth and Fifth Circuits, the Third Circuit has expressly declined to adopt such a presumption. Compare Waldron, 56 F.3d at 496 n.6 ("[T]his is simply evidence like any other and should not be accorded any presumptive value."), with Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996) (adopting an inference of nondiscrimination), and Proud, 945 F.2d at 797 (same).

Furthermore, Parks claims that Salisbury mistreated a disabled co-worker in a similar fashion, evidencing a pattern or practice of disability discrimination. (Id. at 12).  Lastly, Parks asserts that Kabiru and Deimling made several disparaging remarks regarding his health.  (Doc. 26 at 55).  As with Parks's ADEA claim, Salisbury responds by averring that Parks has set forth "no evidence to create an inference" that it was motivated by animosity towards his alleged disabilities.  (Doc. 20 at 5).

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability . . . in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The court will apply the McDonnell Douglas framework, detailed above, to analyze the sufficiency of Parks's circumstantial evidence of disability discrimination.  See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 (3d Cir. 2004); Shaner v. Synthes, 204 F.3d 494, 500-01 (3d Cir. 2000).  To establish a *prima facie* case, Parks must submit evidence which, presumed true, permits the conclusion that: (1) he was disabled within the meaning of the ADA when he was demoted and terminated; (2) he was otherwise qualified to perform the essential functions of his positions at York School, with or without reasonable accommodation; and (3) he was demoted and terminated as a result of disability discrimination.  See Shaner, 204 F.3d at 500.  The parties agree for the purposes of this motion that Parks has established the first two elements of his *prima facie* case.  (Doc. 20 at 5 n.1).  Salisbury contends, however, that Parks

presents insufficient evidence to allow a reasonable factfinder to infer that it acted out of discriminatory animus.  (Doc. 30 at 2).

Parks first asserts that "there are disputes of material fact as to what actually happened during the 'incident' with the student."  (Doc. 27 at 11).  He argues that the accounts provided by the Salisbury staff members "varied wildly."  (Doc. 26 ¶ 21).  Salisbury profoundly disagrees.  It argues that Parks "does not explain whose statements were inconsistent or how the . . . statements were inconsistent" and avers that each statement was "the same in all material respects."  (Doc. 30 at 3-4).  It is clear to the court that the Rule 56 record supports Salisbury's position; there is little, if any, meaningful disagreement between the accounts gathered by Wadsworth following the February 10, 2011 incident.  (Doc. 21 ¶ 28; Doc. 26 ¶ 28).  At most, the four statements describe the incident with varying degrees of severity.  In Stinebaugh's words, "[Parks] turned toward [the student], took hold of [his] arm and said, 'I am tired of you hitting everyone,' " (Doc. 21-21 (Stinebaugh written statement)), whereas according to DeLuca, Parks "grabbed and squeezed [the student's] arms while screaming in his face," (Doc. 21-20 (DeLuca written statement)).  This side-by-side comparison represents the most notable juxtaposition among the accounts collected by Wadsworth; yet the two statements are far from conflicting.  Considered collectively, the witness accounts depict the incident consistently.  (See Doc. 21-17 (Bhalla written statement); Doc. 21-19 (Hollinger written statement); Doc. 21-20 (DeLuca written statement); Doc. 21-21 (Stinebaugh written statement)).  Thus, the fact of Salisbury's reliance on the staff members' statements does not raise an inference of discriminatory animus.

Second, Parks asserts for the first time in his opposition brief that Arnold "used [Parks's pneumonia] as a negative factor in deciding whether to terminate him." (Doc. 27 at 11). Salisbury contends that Parks's argument is unsupported by record evidence and improperly raised at this stage of the proceedings. (Doc. 30 at 6-7). The Third Circuit Court of Appeals and numerous district courts within the Circuit have held that new arguments raised in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." Isbell v. Bellino, 983 F. Supp. 2d 492, 496 (M.D. Pa. 2012) (quoting Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109-10 (3d Cir. 1985)); see also Laurie v. Nat'l Passenger R.R. Corp., 105 F. App'x 387, 393 (3d Cir. 2004) ("[A]n amendment [at summary judgment] would result in additional discovery, cost, and preparation to defend against the new theory . . . ."); Bakare v. Pinnacle Health Hosps., Inc., 469 F. Supp. 2d 272, 296 (M.D. Pa. 2006) ("[A] party is not permitted to raise new claims in opposition to a Rule 56 motion."). This principle defeats Parks's *ipse dixit* assertion. The court finds that his claim is untimely at this stage of litigation. See Isbell, 983 F. Supp. 2d at 496. Hence, Parks cannot satisfy the third element of his *prima facie* case on this theory.

Next, Parks avers that Arnold's testimonial statement of the reasons for Salisbury's decision to terminate Parks evidences discrimination. (Doc. 27 at 12). Specifically, he argues that Arnold's stated reliance upon Laucks's account of the February 10, 2011 incident is disingenuous because Laucks did not actually witness the interactions between Parks and the misbehaving student. (Id.) Parks further notes that Arnold "conceded" this fact during her deposition. (Id.) In response,

Salisbury contends that "[t]he significance of . . . Lauck[s]'s statement is that [Salisbury] did a thorough investigation by getting statements from everyone in the room and no one (other than [Parks]) gave a statement which contradicted the fact that [Parks] grabbed an 8 or 9 year old child with autism and yelled at him." (Doc. 30 at 8).  It is apparent to the court that Parks's discussion of Arnold's testimony misrepresents the record.  Arnold's deposition transcript is clear on the point in question; she noted that Laucks did not actually witness the incident, but included him among the group of staff members whose testimony she relied upon in deciding to terminate Parks.  (Arnold Dep. 55:23-56:5).  Parks's allegation thus falls far short of creating an inference of discriminatory animus.

Parks additionally asserts that "a review of the testimony of Donna Stinebaugh . . . indicates that she was also discriminated against on the basis of her disability by the same key players referenced in this case (especially Jamie Deimling).  As a proper and similarly situated comparator, reasonable fact finders could conclude that [Salisbury] has a pattern or practice of discriminating against the disabled or those regarded as disabled." (Doc. 27 at 12).  Salisbury counters that "without any specification or citation to the record" this "bare assertion" is unsustainable.   (Doc. 30 at 9).  To establish a pattern or practice of discrimination, Parks must show that discrimination is Salisbury's "standard operating procedure—the regular rather than the unusual practice." Berry v. Jacobs IMC, LLC, 99 F. App'x 405, 410 (3d Cir. 2004) (quoting United States v. Lansdowne Swim Club, 894 F.2d 83, 88 (3d Cir. 1990)).  Not only has Parks failed to raise such an inference, he has directed the court to absolutely no record evidence tending to

establish that Stinebaugh had a disability or that she experienced an adverse employment action.  This phase of litigation demands much more: "to survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted); see Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009).  Given the complete dearth of evidentiary support, Parks's averments cannot establish the third element of his *prima facie* case.

Finally, Parks attempts to create an inference of discrimination by alleging that Deimling and Kabiru made disparaging remarks about his disabilities.  (Doc. 21 ¶¶ 72, 75; Doc. 26 ¶¶ 72, 75).  Specifically, Parks testified that on one occasion, after he requested permission to take his class outside for a nature walk, either Deimling or Kabiru responded by asking, "Are you sure you can make it that far?"  (Doc. 21 ¶ 72; Doc. 26 ¶ 72).  Parks also contends that when he submitted a doctor's note to Kabiru, she commented, "You sure go to the doctor a lot."  (Doc. 21 ¶ 75; Doc. 26 ¶ 75).  He does not recall when Kabiru made this statement or whether others were present at the time.  (Doc. 21 ¶¶ 76, 77; Doc. 26 ¶¶ 76, 77).  As discussed *supra*, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold, 983 F.2d at 545.  Parks's assertions are vague and utterly lacking in temporal context.  See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002) ("The non-movant may not rest upon . . . vague statements."); Ezold, 983 F.2d at 545.  Furthermore,

neither Deimling nor Kabiru were involved in making the adverse decisions at issue in Parks's case.  (Doc. 21 ¶¶ 42, 46-48; Doc. 26 ¶¶ 46-48; Smith Dep. 28:8-28:11; Arnold Dep. 13:1-14:4); see Ezold, 983 F.2d at 545.  Therefore, the court holds that no reasonable jury could conclude, based upon the stray remarks alleged by Parks, that Salisbury harbored a general animus towards individuals with disabilities.

Parks's ADA claim ultimately fails for the same reason as his ADEA claim: Parks cannot establish a *prima facie* case of discrimination.  Accordingly, the court will grant summary judgment in Salisbury's favor on the disability discrimination claim.

## IV.   Conclusion

For all of the foregoing reasons, Salisbury's motion (Doc. 19) for summary judgment will be granted.  An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        January 15, 2015